Good morning, and may it please the Court. The District Court's order trivializes the importance and strength of the attorney-client privilege, and misconstrues the nature and amount of evidence required to overcome that privilege under the crime-fraud exception. No Court has ever before used a litigation dispute about a claimed oral agreement contradicting the terms of a written contract to pierce the privilege of an attorney-client. Under any standard, there is nothing unlawful or illicit in Bertelsmann's claimed conduct, and plaintiff's evidence at most suggests that Berry believed that he could rely on his own unilateral interpretation of the draft contract language, which, of course, was later changed to cut off that very possibility. Plaintiff's theory is inconsistent with their own evidence, and that evidence itself was contradicted not only by Bertelsmann's representatives, as the District Court noted, but also by Berry's own partner and lead deal counsel. The District Court's error was compounded by its belief that it could pierce Bertelsmann's privilege merely by reviewing the plaintiff's evidence only under an extraordinarily lenient standard that is unprecedented in civil litigation. Counsel, what is our standard of review? We believe the standard of review in this case is de novo. This Court has frequently resolved attorney-client privilege issues under a de novo standard. We believe certainly that... Discovery context? Well, as Your Honor notes, discovery orders normally would be subject to an abuse-of-discretion standard. We readily acknowledge that. But in the attorney-client privilege context, this Court has repeatedly, in Bower, in Chinn itself, and in other contexts, said, we're going to review this on a de novo basis. What are those discovery dispute cases? I believe many of them were. Bower was not. Bower was a trial testimony case. What's your best case authority for the proposition that resolution of an attorney-client privilege in a discovery context has a de novo standard of review? I think probably our best cases are the MET case and the U.S. v. Doe case, 429 F. 3rd, 450. Counsel, let me put it a different way. Suppose that we're abuse-of-discretion, like the general world is, abuse-of-discretion. If the district court gets the law all wrong, that's a de novo review. We say, sorry, you abused your discretion. We review the law de novo. You lose. If the district court gets the facts absolutely wrong, we say, that's clearly erroneous, and you abused your discretion. It's a practical matter when you read through the cases. Is anything really very different happening? Let's say the district court gets the law perfectly right and gets the evidence to a clearly erroneous standard correct. Do we still review it de novo, or do we say, well, if you get everything else right, then we'll review if you abused your discretion? I think, Judge Fernandez, you're exactly right, that even within these other standards, you say overarching standards of abuse-of-discretion. If a district court gets the law wrong, that itself would be reviewed de novo, but it would constitute an abuse-of-discretion. I'm sorry. Go ahead. With respect to the evidence, and we certainly do talk about the evidence, I mean, our basic view is that there is no evidence whatsoever, and that type of a no evidence argument is normally done on a de novo basis, that it is a question of law whether there's any evidence of a fraudulent scheme here. Ultimately, we do rely on our backup argument somewhat to say that if you thought that there was something here, that even then, the district court applied the wrong standard in applying this extraordinarily lenient standard, which is simply did the plaintiff put on some evidence that could lead some person? I'm going to ignore the other side's evidence, but did you put on some evidence that could lead a person to believe that? We don't think that's an appropriate standard in the civil context. Now, it makes perfect sense in the grand jury context, because grand juries are surrounded by secrecy. It's not an adversarial proceeding, and the courts have made clear in numerous cases, grand jury cases, that we're not going to have many trials and long hearings on this issue. But every case that has looked at this until this court, until this case, has said in the civil context, we're going to look at it differently. The Haynes case from the Third Circuit says that. The N. Ray General Motors case from the Eighth Circuit says that. Three different district courts in this circuit said that before this case. Counsel, did the district court look at it in alternative ways? It absolutely did, Your Honor. It said in the alternative, you know, even under the standard propounded by Bertelsmann, that the court finds that there was sufficient evidence. So why doesn't that refute your argument, then, that there was an error of law? I think it's important to understand the standard that the district court was applying. Then in its backup argument, it says, well, I think the evidence satisfies that standard as well. And at that point, what we would like the court to do is review the evidence. What is the evidence that the district court relied on? Well, the court said, well, there are three primary pieces of evidence. There's Mr. Berry's testimony, there's an e-mail that he sent, and there's a memo that was written by Ms. Tim after a conversation with Ms. Berry. The e-mail and the memo contain a conclusion that is based on a conversation that took place at that meeting on October 24th. So that is the key. What happened on October 24th? Mr. Berry testified. Now, we have people. So what's the answer to my question? The answer to the question is there's no evidence. Even under that standard, the district court got it wrong because there is no evidence that Bertelsmann undertook a fraudulent scheme. And because that is a no-evidence point, the court should review the evidence and resolve it in our favor. One thing that's striking about this case is that the district judge did not review any of the disputed documents. Or exchanges or whatever form they took in camera, but simply ordered that they be produced. Can you explain to me why the district judge did not take this intermediate step, which is a fairly common step to take in attorney-client privilege cases? In fact, Judge Fletcher, many courts have said it's a required step. My personal belief, the reason it didn't happen is because the movants didn't ask for it. It's clearly the movants' burden. Martin says that. They didn't ask for it. And did you ask for it as an intermediate step, saying, well, wait a minute, before you move to outright discovery and handing over all the stuff, why don't we do this sort of intermediate? Why don't you have a look, Judge, yourself, and then we can go from there? Did you ask for it? No, Your Honor, we did not ask for it. Are you asking for it now? No, we're not especially asking for it, in part because what the plaintiffs wanted to do in this case is they don't want documents that relate solely to this one ground of how these documents would be or how the proceeds would be used, perhaps for litigation expenses. They asked for, and the district judge gave them, all documents related to the negotiation of this contract, or so it would seem from the court's order. It's a very broad. They want a very broad discovery relating to privileged materials. And the district court, one of the errors the district court engaged in, was that it failed to abide by the in furtherance standard. It didn't do any review relating to any of the claimed communications, in fact, because plaintiffs didn't ask for any kind of in camera review and never in their papers really identified claimed identifiable communications that they said were in furtherance of this alleged fraudulent scheme. There are no findings in the record. And we think, of course, that there can't be. But certainly we keep winding up, wandering off into specific factual questions in this case. It strikes me the difficult questions in front of us have to do with legal standards. For example, if a prima facie case is enough, the question is, and I suppose you can say, as is often true in evidentiary questions, all you have to do is make a foundational showing to establish your prima facie case. Certainly, unless we're using the word in a strange way, that doesn't mean you've established your case because you've established your prima facie case. Prima facie means you get to go forward. So if a prima facie case is found, what's the next step? I suppose the district court could then go to an in camera review. The Supreme Court seemed to have said that. But if it doesn't do that, does it have to consider the other party's evidence then before it makes a final decision? Or can it just say, well, this is a prima facie case, the end? Well, we think the standards should be the standard that is discussed, and particularly Judge Aldersert's opinion in the Haines case, we think sets it out in some great length, as do some other cases, and that is prima facie in the civil context suggests that the movements have an initial burden and that even at that point, the district court really is obligated to hear the other side's arguments, look at their evidence, and making even that initial determination, as you would point out under Zolan, of whether you should look at the documents in the first place. We certainly believe, one, that that's the appropriate standard and that it wasn't satisfied at all in this case. It simply couldn't be. I would like to refer back to this meeting because Mr. Berry. Can you stick for a little bit longer with Judge Fernandez's question about under what circumstances should the district judge be under what circumstances, if any, should the district judge be required to look at countervailing evidence as distinct merely from the evidence presented by the moving party? Well, we think in the initial review, a district court would be required to evaluate both sides' evidence in a civil case where it is an adversarial process, has to even under the initial motion look at it before even making that initial determination of whether, for instance, if a party had requested in-camera review, even before that you would have to evaluate both sides' evidence. But it may be given what I think you just told me, in-camera review is not in front of us because neither party asked for it nor seems even now to be asking for it. We certainly do not think the record supports their motion. It's their burden. We think that they have not satisfied that burden. Well, you're saying that in deciding whether there's a foundational prima facie case, the court must consider the other party's evidence. Is that correct? Yes. Are you saying it sounds like that's what you're saying. Yes. Which is not the normal standard in evidentiary or discovery questions, I don't believe. Prima facie case, the party wanting something establishes a prima facie case, and then you go to step two. The question is what step two becomes. But not at the prima facie case level. The opinions that have discussed this in the civil context, we believe, suggest that what the courts really mean in prima facie is not specifically the first level of, you know, what might otherwise be a Title VII type inquiry, but that the plaintiff needs to get over a certain hump, has a burden, but that then there is an opportunity to, for the other side to present its evidence. And so that even within that discussion of prima facie, there is, in fact, an opportunity for the non-movement to come in, present its evidence, present its arguments, explain why there isn't any basis for anyone to believe that there's some fraudulent scheme. What case are you relying upon for that rubric? I think generally one of our best cases is the Haynes case from the Third Circuit. We also believe Judge Brazil's opinion in laser industries is very well thought out. It is followed by other district courts in this circuit. So are you saying those cases require as part of the prima facie case that both sides' evidence be considered? Yes. Getting to the basic idea of whether there has been any kind of showing of a prima facie case at all, again, the e-mail and memo that are in question focus in on Mr. Berry's report about his perceptions of a meeting. Key, then, is what happened at that meeting. That meeting, which is in Mr. Berry's testimony, he doesn't say I asked that I be able to use the money for litigation expenses and let's do you agree with it? What he said was I asked for it, Mr. Kajanov said, no, we're not having any side letters, the agreement is what it is, and Mr. Berry said, and I said, okay, I just want everyone to understand that I believe that GNA and overhead includes litigation expenses, and literally that was the entire conversation that went on for two minutes. Mr. Berry later makes clear that because he had announced his interpretation of the terms general and administrative and overhead that were in the draft language, and because nobody specifically rebutted him, that he left the meeting believing that he had an agreement on that. What's wrong with that? That sounds like pretty good reasoning, or at least decent reasoning. The evidence makes clear that what, obviously Mr. Berry wanted that, he wanted to use the money for more than we were willing to say it could be used for. He was looking for an ambiguity, something that would allow him to argue that, all right? Ambiguity comes up in the corporate context all the time. It doesn't mean that the other side agreed, and there's no evidence that Bertelsmann ever said, okay, go ahead. There's no evidence of that at all. I've got a different question which comes at it from the opposite direction. What is wrong with using that money for litigation expenses? Well, we don't think there's anything wrong with it whatsoever. Then why are you so anxious to say that we didn't want it to be used that way and there was no agreement that it could be used that way? Well, the evidentiary record, I think, shows two things. One, use of that money would have been completely protected by Knorr Pennington, and there was nothing wrong with it. But two, we had a subsidiary that really didn't want the money to be used for that purpose. And perhaps more importantly, we were loaning the money for a particular purpose, to shift Napster away from what it had been to a fully licensed pay system. That's what we wanted the money to be used for. But in some ways it's so artificial to say, well, you can't use it to fund litigation expenses so long as there's some pot of money, because money is essentially fungible. It's not as though you're setting up separate trust funds when you're donating to a university. Well, this is to be used for the library, and that's to be used for classroom teaching. I mean, they've got a pot of money, and if you say, well, you can't use this for litigation expenses as long as they have other money, well, they'll use the other money for litigation expenses. They'll use your money for the purpose the other money would otherwise have been put to. I don't understand the fight. I think that's entirely true, Judge Fletcher, in economic terms, but in emotional terms and negotiating terms, that's not always true. People do care about things. This was an issue that had been established early on. Again, to the extent that it was discussed in this meeting at all, it was simply a blip. The most important thing, I think, that comes out of the testimony is not only the fact that there was no agreement, and that's the foundation of their argument, that there was an express agreement and that it was secret, and that's the other thing. Mr. Berry was under no obligation. If he said he had a verbal agreement to use money for litigation expenses, there would have been nothing to stop him from telling the world about that because if he had a verbal agreement, there's nothing in his testimony that says, oh, and by the way, they made me keep it secret. So we don't think that the evidence at all supports this idea that there was a fraudulent scheme by Napster. This is a situation in which there is a corporate transaction being negotiated. One party is looking for some ambiguity to give him some wiggle room later on. And if that becomes the basis for a crime-fraud exception, then every case that has historically been thought of with relation to, you know, plural evidence and, you know, can you argue that there is a verbal agreement, can be set up in exactly these types of terms and set out. Why don't we do this? You've got a little time left on the clock. Let's hear from the other side, and then we'll hear from you in rebuttal. Thank you very much, Your Honor. Good morning, Your Honor. May it please the Court. This is not a case. I'm sorry. Could you identify yourself for the record? And I neglected to ask, but first we'll do it when you come up in rebuttal, if you could also identify yourself for the record. Peter Simmons on behalf of Capital Records and the other EMI parties. Your Honor, this is not a case of the district court vitiating the attorney-client privilege based on a disputed contractual interpretation. It's a case where the district court found there's reason to believe that the contract that Bertelsmann repeatedly proffered for the Federal courts as evidence of its relationship with Napster is, in fact, a sham. Manufactured by Bertelsmann to camouflage the true extent of its involvement with Napster and camouflaged what they needed in order to reduce its risk of liability. Far from resting on the testimony of one witness as Bertelsmann tries to portray it, the district court's opinion is supported by an array of contemporaneous documents from numerous sources, including a lawyer at Wilson-Sonsini and Bertelsmann's own lawyers. Well, counsel, both sides just want to talk facts, and I understand that. Okay. But sometimes the appellate court is supposed to be interested in things like law. And what's troubling me here, and it's not a very good question. It's sort of an in-your-face question, I understand. I don't understand why anybody in the legal profession wants to drive the attorney-client privilege down to such a low level as was done in this case. Prima facie case, only the evidence on one side has to be considered, and then, boom, the privilege is gone. Don't do in-camera review. Don't listen to the other side. Don't have to listen to the other side. But the standard is, I think they present it enough. It's kind of like going into a trial where a jury is going to find the facts. The judge just says, is there any evidence there that a rational jury, listening to those facts, could decide X? And so it lets the evidence in. It sounds like that. That low a standard, and I'm having a hard time understanding that that could be the law and why anybody would want it to be. I don't think we're saying that it's, quote, that low a standard. The standard is what this Court set out in Chambers. That's what she said, isn't it? I mean, basically, you need a prima facie case and I don't have to listen to the other side. But, in fact, Judge Patel did listen. But I'm asking you, I'm talking about the legal standard. I don't know if she, in fact, listened to the other side or not. She said, well, anyway, even if I listen to them, it's good enough on some kind of basis. We're not sure what. I think it is appropriate for the district court to listen to the evidence on the other side, but it does not need to go ahead and hold a mini-trial and then resolve by a preponderance standard, as Bertelsman argues, who's right. I think the nature of the adversary system requires that they at least be given the chance to come in, contest the evidence, and see whether, in light of whatever they show, I mean, maybe the evidence that the movement proffers is completely out of context. And if they show that to the judge, the prima facie case goes away. So you agree that the district court admonitio is wrong. The district court's basic position that the Ninth Circuit law tells the district court, and it is indeed the fact, that all the court has to do is listen to the evidence of the attacking party, the end. It listens to the evidence and says, hmm, sounds pretty good. I see the memo. I see the memo from Mr. Berry. Looks good to me. Looks like there was a deal, the end. The district court said that would be enough, it seems to me. I take it you agree that is not enough. I agree there is Ninth Circuit law that could lead to that conclusion, but certainly the Third Circuit and the Seventh Circuit in the Feldberg case have said otherwise. Yes, I'm asking if you concede the district court didn't get that right. I think it would be more appropriate for the court to look at both sides' evidence before determining if, in fact, the prima facie case is correct. More appropriate sounds like that would be a nice thing to do, but you don't have to. You know, a lot of things are more appropriate, but they don't need be done. They're just sort of nice. Is that what you're saying? It's nice or that it's required? I think it would be required for the district court to at least consider what the other side has to say. If they can put the evidence in some other context that would eviscerate the showing of prima facie case, I think the district court would have to do that. Okay. To the extent the district court thought otherwise, you agree that that was incorrect? I think that's right, Your Honor. But I think the court was correct that she does not need to hold a mini trial. There is no case law that supports that proposition. You don't need to come in and weigh the evidence and say, okay, who's right and who's wrong. The question is, in light of the evidence presented by both sides, is there still enough here that we have reasonable cause to believe that the attorney's services were used in furtherance for a crime or a fraud? Now, assuming that the district judge does allow both sides to present evidence, and assuming that the district judge decides whatever is likely to be true based upon the presentation of evidence by both sides, what standard of proof does the district judge need to have, not merely to have in camera review, but simply to order the discovery? I think you're going to say you don't need preponderance of the evidence, and why don't you? You don't need preponderance of the evidence because that's not what Chen and Lawrence hold. What you have to show is reasonable cause to believe that the attorney's services were used in furtherance for a crime or a fraud. But you don't need more likely than not? You do not. And that's expressly said in the Chen case. Well, I'm not sure Chen needs necessarily to be read that way. So if we could argue it based upon, at least for the moment, what you think a good rule is rather than what Chen requires, I'd appreciate it. Why? I mean, it's pretty serious business to say to a lawyer and to the lawyer's client, open up your files and reveal all your communications because I don't even think it's more probable than not that you engaged in the crime or fraud exception. I think there's a possibility, but I don't think it's more probable than not. But open up your files. I mean, why is that the thing that should happen? I mean, I think that's what should happen because if there's enough threshold shown from nonprivileged evidence that gives the judge reason to believe that there's a problem, more than a mere suspicion, but it doesn't have to be a preponderance because, you know, all the evidence, in effect, is not in. This is a discovery ruling at this point, not an admissibility, a trial ruling. But there's a mechanism by which you don't have to violate the privilege in the sense of vitiate the privilege in the sense of handing over the evidence to the other side based upon a lesser showing than preponderance of the evidence, and that's to have in-camera review. And Zollin makes clear that that is an optional step for the district court under a somewhat different standard. But Zollin said that was an optional step in the sense it didn't say that I can read. It didn't look like it said. The option is the district court can say just turn it over. The option was the district court could either do nothing or hold an in-camera review, looks like to me. Respectfully, Your Honor, I don't think the case goes that far. Zollin didn't expressly decline to address the standard of what's necessary to pierce. It's icky, and it's not clear about what happens if the district court decides not to do an in-camera review, but it kind of looks like there's a prima facie case, and you can decide to say no or do an in-camera review, or you can decide it doesn't seem to say you can say yes without it. Well, I think it does open that possibility because in Zollin's case. Possibility? You think it holds that? It certainly doesn't hold that. No. It seems, its structure seems to be that you do a prima facie case, and you can say to the plaintiff or the asking party, nope, no deal. Or you can say there's enough there. I think I'll do an in-camera review. I think it's a question of the degree of proof. What Zollin contemplates is if you have more than a mere suspicion, but perhaps you haven't gone that high up the meter, and the Court says, okay, I have reasonable cause to believe that in-camera review may help, then you go to the in-camera review. Right. That's utterly consistent with this Court's decisions in Shannon Lawrence that say if the fresh, if you get to an even higher level of proof, still perhaps below preponderance, but higher than the level where you just say, okay, let me actually look at the documents in camera, but if you have enough of a showing, as I think we had here. You might be at point A, there's just sort of a kind of prima facie case, and the district court there could say, I'm going to do an in-camera review. Or you might be at part B where it's, I'm not really sure. I've heard both sides, and I'm not sure, and the district court can do an in-camera review. Or it may be the evidence is so over the top, the Court says, I don't need to do a stinking in-camera review. I'm just going to turn it over. Is that what you think? That's what I think. I think that is a legitimate interpretation of the cases, and it makes sense. It doesn't sound like the district court in this case would explicate the law just that way. Whether or not the district court would explicate the law that way, I think the facts in the case absolutely support what she did on that basis. I understand. Okay. But in fact, the evidence is showing that was the case. Maybe that's the standard, and now you want to tell us by the facts, say, that you met the top standard, correct? Correct. That we had so much evidence in the case, not only the contemporaneous memos from Mr. Barry, from his lawyers, from Bertelsmann's own lawyers. In fact, the way Bertelsmann performed the contract, the way the parties performed the contract, is consistent with the secret handshake deal that was made. Namely, the money was spent. Over $10 million of Bertelsmann's money was spent assisting Napster to keep the litigation going that helped keep the file trading going on. And in answer to Judge Fletcher to your question, in any other case where the company had a pot of money, it might be fungible. That wasn't the fact here. Napster was flat out of money but for Bertelsmann's funding. So it was critical. The only way they could keep the litigation going, among other things, that would enable them to keep the file trading going and keep the infringements of our copyrights going was using Bertelsmann's money to do it. But Bertelsmann didn't want to be seen to be assisting in any way the perpetuation of file trading over Napster. That's what this is all about. But if that's so, why did they make the loan in the first place? Because if they're keeping Napster afloat, obviously they are assisting in some way. Ah, because what Bertelsmann figured is, yes, at some point, it may take six months, it may take 24 months. At some period of time, not immediately, we think we can convert Napster into a law. No, I understand that. That's not my question. You said Bertelsmann did not want to be seen as assisting in any way Napster in carrying on this, what you regard as an illegal activity. Simply providing a loan to keep Napster afloat is, of course, assisting in some way and assisting Napster to do that. So they can't be right. That, of course, is one of the underlying issues that we're litigating, is the extent of their involvement, the extent of the assistance they provided. Well, they provided a fair amount of dollars. Absolutely. They'd like to portray themselves as Bank of America merely making an arm's-length loan and taking no role in Napster's affairs and having nothing to do with the ongoing infringements. We think that the extent of their involvement, not limited to the $85 million they poured in, that that's one critical piece of evidence. I'm having trouble seeing whether they structured the loan to obscure the fact that they were financing litigation activity, whether they simply lent them the money and maybe there was a side agreement and maybe there wasn't. I'm having trouble seeing why that's fraud on the court. The fraud on the court is not just in the way they structured it. The fraud on the court is in saying one thing and doing another. Well, but lots of things, excuse me, let me say it this way. Saying one thing and doing another may be fraud. It may not be fraud. And it certainly may not be fraud on the court. So why is it fraud on the court under your theory? Because they repeatedly represented to the district court, to the special discovery master, to the bankruptcy court that the promissory note and the terms of their transaction are exactly what's on the face of the documents and none of their money ever went in any way, shape or form to supporting the file trading. Okay. And they are purely a lender like Bank of America would be. That simply was not true. Lawyers and their clients frequently tell things in court that are untrue. The mere fact of saying something false in court does not mean that it's fraud on the court. So conceding for the purposes of the discussion for a moment that what they said was untrue, why is that fraud on the court? Because it was knowingly untrue and it was designed to distance themselves from the actual operation of Napster so that the court would believe. Yeah, but how is that different from almost any testimony offered at trial in order to protect yourself, which may or may not be true? I mean, if that's enough to pierce the attorney-client privilege, well, there's going to be a lot of work left for lawyers in terms of handing over their files. I mean, I'm not yet – I don't yet see how this is different from a lot of litigation behavior that seems not to be fraud on the court. Because there is never a licensed judge to come in and lie to a court, lie repeatedly about what the nature of the transaction was into camouflage. I mean, what they did was manufacture evidence. Well, where is the – you know, lie is a wonderfully colorful word. But they come in and they say, yeah, we gave all this money to Napster, but it wasn't for the purpose of keeping them afloat so they could do big naughty. And, you know, how dumb are courts? I mean, Judge Fletcher put the question beautifully. You give me 50 million bucks to do X, and so I can – and I'm diverting other money to do the litigation instead. So everybody knows that that can happen. That's not too difficult. And anyway, every dollar you spend to help Napster helps Napster go on with its evil doing. Does it not? We think it does, absolutely. Bertelsmann is the one contesting in the underlying copyright litigation. So litigation or no litigation, it's got to be obvious to the court that making this enormous loan – and they had the terms of the loan, and I think at some point it allowed them to step in and do something at some point later on, I believe. So they have this – they make this enormous loan to Napster, and presumably if Napster doesn't get it, it's going to be in deep trouble, i.e., it's going to have to shut down, right? That's correct. Without permission, they would have turned off the lights. Isn't that obvious to the court, whether the money went to litigation or not? Or is it that lawyers are so tough that what Napster said was, geez, if we don't pay our lawyers, we're really in the bucket, but we can hold off every other vendor? No. The problem, Your Honor, is that Bertelsmann is the one contending in the underlying litigation. Bertelsmann is the one contending in the underlying litigation that our money wasn't used for any of that. We had nothing to do with file trading. We separated ourselves from file trading. And the point is that story that they're telling is untrue and is knowingly untrue, and they papered the transaction intentionally in a way to cover it up. But you say it can't be right, meaning if Bertelsmann says we lent them all this money and we had nothing to do with file trading, you have to understand the statement we had nothing to do with file trading as preposterous on its face. That is to say they are financing a company that is engaged in file trading. We agree with that. That's not fraud. That's just an idiotic statement. We agree with that, too, Your Honor. But the problem is ultimately we have, you know, it's not just a matter of saying it's idiotic. We need to be able to prove at trial that that's not true. And one of the ways we want to be able to prove it, in addition to the evidence we already have showing that, in fact, Bertelsmann had everything to do with the file trading, is that they were engaged in a cover-up. And the cover-up is consciousness of guilt. And that is certainly probative evidence of their willfulness, of their intent, which is absolutely an element for purposes of the copyright infringement case. So now we're back to they have to disclose all the attorney-client relationship because of what's obvious to everybody in the world. Anyway, they have to disclose everything in the attorney-client relationship because some of the money was diverted to litigation expenses and they knew that. And that's the whole nub of this thing, right? And that's why they've got to do it. Because not that some of the money was diverted. Some of the money was intended to be used, was designed to be used. But Bertelsmann said, let's not tell anyone and let's make it seem like we're not. Right. Because some of the money was used for litigation expenses. Over $10 million. I do need to leave some time for Mr. Ramos, so go ahead. I'm sorry. Perhaps we should hear from Mr. Ramos now, then, because we're running out of time. It would have been more useful if at the beginning I'd known that we were sharing time. I apologize. How much time had you intended to leave for Mr. Ramos? I intended to leave him about eight minutes, but we're obviously a little bit less than that. Well, Mr. Ramos, say what you need to say and we'll see how long it takes. I'll proceed. And you can send him an invitation to lunch for which he'll pay. Okay. Thank you. May it please the Court. I represent the Lieber plaintiffs who are songwriters and music publishers in a separate action that's been consolidated with the EMI action against Bertelsmann. And I would begin by saying that I think that much of the colloquy that just took place demonstrates why the collateral order doctrine doesn't apply here. Because the issues with regard to the application of the crime fraud doctrine are inextricably intertwined with the merits of the case. I think, Judge Fletcher, your questions about the, you know, whether or not this was a fraud or whether or not it was a successful fraud relate directly to the question of whether or not there was copyright infringement here. On a contributory infringement or a vicarious infringement theory. And the cases from the Supreme Court and the Ninth Circuit, I think, make it very clear under those circumstances that the collateral order doctrine should not apply because this Court then winds up getting involved in the merits of the case before the case is tried. And for that reason, we think the Court should dismiss this appeal. We've got a fair number of cases in this circuit now in which we've heard on collateral order appellate review various discovery disputes where the issue is privilege. Yes, that's correct, Your Honor. But the point is not whether or not the issue is privilege, but rather whether the privilege issue is independent of the merits of the case. Your Honor, I think, has decided a couple of cases, one involving habeas petition, one involving a criminal case, United States v. Green, in which on appeal there was no relationship between the privilege issue and the merits. In both of those cases, there was no dispute as to the merits on the appeal. The privilege issue was entirely independent. And I think that line of cases is distinguishable for that reason. Here, the issue is, as I said, I believe, inextricably intertwined. Now, it may or may not be depending on the nature of the decision. For example, if we were merely to hold that Judge Patel applied the wrong standard and said nothing other than that and remanded, we wouldn't be touching the merits at all. The — well, I guess I have two responses to that. The first and more important response is that, in fact, Judge Patel applied both standards. She applied both the prima facie evidence standard and the preponderance of the evidence standard. And she said that under either standard, she found that the crime-fraud exception applied. And I think because of that, it really — it really doesn't matter. And this also goes to the question of the standard of review. I think that because she applied both legal standards, that her decision was essentially factual. Kagan. Now, there's another thing to say, and that is the collateral order doctrine sort of a little checklist says independent of the merits. But that's often not true. I mean, we say that. But everyone understands that that's a term of art. And that often you do have to have some slight indication as to what's going on in order to understand what's on appeal on these interlocutory orders. Well, Your Honor, I — with all due respect, I think that the Supreme Court has made it very clear that it's a narrow exception. It's said that repeated times. And I think that to reach out to take this appeal and consider this appeal really is — You know, the Supreme Court said that. The problem is the Ninth Circuit might be absolutely cracked. And some people might think so. But the Ninth Circuit has, in effect, said you can appeal privilege. You can bring it up collateral — I mean, on a collateral order. I'm not so sure the Supreme Court would go along with that. But that's what we said. And this panel is going to have a real hard time fighting that. Your Honor, I could only — I could only stand on the Supreme Court doctrine. I think that here — Our last ruling came after the last Supreme Court ruling. This isn't — Judge Fernandez, I think this is an unusual case. An unusual set of facts. My colleague addressed those facts. And it may very well be true that the fraud on the court here was not well executed, is not — and is hard to believe. But there's no question that that's what the parties intended. When they wrote that promissory note document, they wrote those words in there for a reason. It's the very first page. Okay. Now, if you're going to get back into the facts, I think we don't need to hear from you any longer. I was going to — I was going to wrap up here. Okay. I'm simply saying that I think that the — I was trying to reinforce the point that the merits here, I think, are very tightly tied to the privilege issue. Okay. Thank you. Thank you. And we gave you a little extra time, and I think that was probably — I think you needed — I think you said what you needed to say. I did, and I'm grateful for it. Thank you. Thank you. You've saved some time. And if you could — I'm sorry, I neglected to remind you. If you could identify yourself for the record. Greg Coleman for Burlesman. Thank you, Your Honor. Again, we believe that it is important for the Court to announce the standard, but I do also want to make clear that we also believe that we win under any standard. In the briefs and in our oral argument today, there have been a number of statements that purport to be set out as fact, and we simply believe, again, without going through all of them, that the record just doesn't bear that out. This is not a fraudulent scheme set in motion by Burlesman. We made clear that we wanted our money to be spent to develop a new system. Mr. Berry's testimony makes absolutely clear. He's the one that came to us when he was told no in that meeting. He said, well, look, I just want you to understand, I'm going to interpret these terms in the contract to allow me to do this. And when he was asked later on if the contract was false, he said, no. The contract had those words in it, and I interpreted those to allow me to do this. Now, that's not fraud by – it's not fraud at all, and it's not fraud by us. It's Mr. Berry seeking an ambiguity that allowed him to use money in a way that he felt he wanted to. You know, do you want to – since you want to talk about this, guys, do you want to address the thing that seems troubling, that after Berry did Big Naughty and diverted your funds to litigation, I think there's something in the record somewhere that you then gave him another $25 million? That's absolutely true, Judge Fernandez. We did. And without going into a lengthy explication of what happened, obviously when we found out about it, the record is clear that our executives were very irate. But at the same time, they had to make a tough decision. Do we sue Navster and shut them down for breach of contract, or do we stay committed to a project that was important to us and that we felt would be for the benefit not only of ourselves but for the industry? And they made a tough decision to stick with the project and see if they could get it done. That's all there was to it, plain and simple. There was a decision that there was a lot of water under the bridge. There wasn't much we could do about the fact that Mr. Berry had breached our contract, but it was still a worthwhile project. Thank you, Your Honors. I thank both sides for their useful argument. UMG Recording v. Bertelsman v. United States District Court is now submitted for decision.
judges: Fernandez, W. Fletcher, Rawlinson